NOTICE
Decision filed 07/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250582-U

NO. 5-25-0582

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-923 |
| | ) | |
| ANDREW C. TOMS, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in denying the defendant's second amended motion to withdraw his guilty plea. Because no argument to the contrary would have arguable merit, appellate counsel is permitted to withdraw, and we affirm the judgment of the circuit court.

¶ 2    The defendant, Andrew C. Toms, appeals the judgment of the circuit court of Champaign County that denied his second amended motion to withdraw his guilty plea. The Office of the State Appellate Defender (OSAD) was appointed as the defendant's counsel in this appeal. OSAD has concluded this appeal lacks arguable merit, and, on that basis, has filed a motion for leave to withdraw as counsel, pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a supporting memorandum of law. OSAD properly served the defendant with notice. This court gave the defendant the opportunity to file a response to OSAD's motion. The defendant has filed a

1

response, which we discuss in detail below. Having considered OSAD's *Anders* motion and memorandum, the defendant's response, and the entire record on appeal, this court agrees with OSAD's assessment that this appeal is without arguable merit. We therefore grant OSAD's motion to withdraw, and we affirm the judgment of the trial court.

¶ 3                                 I. BACKGROUND

¶ 4     The facts necessary to our disposition of this appeal are as follows. They are derived from the record on appeal, or, where cited as such, from our order in one of the defendant's earlier appeals in this case, *People v. Toms*, 2025 IL App (5th) 230275-U. On August 2, 2020, the State charged the defendant by information with the offenses of aggravated battery with a firearm (count I) (720 ILCS 5/12-3.05(e)(1) (West 2018)), a Class X felony, and unlawful possession of a weapon by a felon (count II) (*id.* § 24-1.1(a)), a Class 3 felony. *Toms*, 2025 IL App (5th) 230275-U, ¶ 4. The State alleged that on August 1, 2020, the defendant knowingly discharged a firearm during the commission of a battery, thereby causing bodily harm to the victim, Christian Mbemba. *Id.*

¶ 5     On October 2, 2020, the State filed an amended information with two additional charges against the defendant: attempted first degree murder (count III) (720 ILCS 5/8-4(c)(1)(D) (West 2018)), and armed habitual criminal (count IV) (*id.* § 24-1.7(a)), both Class X felonies. *Toms*, 2025 IL App (5th) 230275-U, ¶ 7. Count IV was later amended to the offense of aggravated unlawful use of a weapon. *Id.*

¶ 6     On November 19, 2020, the defendant was rearraigned on counts I and II, and arraigned on counts III and IV. With regard to count I, he was told that, *inter alia*, he "could go to prison anywhere from six all of the way up to sixty years," and "[t]hat would be followed by three years of mandatory supervised release." He stated that he understood. With regard to count II, he was told that, *inter alia*, he faced a sentence of "anywhere from two to ten years," and "[t]hat would be

2

followed by one year of mandatory supervised release." He stated that he understood. With regard to count III, he was told that, *inter alia*, he could "be sentenced to prison anywhere from 25 years to natural life," which "would be followed by three years of mandatory supervised release." He stated that he understood. With regard to count IV, he was told that, *inter alia*, he could "go to prison if convicted anywhere from six to sixty years," and "[t]hat would be followed by three years of mandatory supervised release." He stated that he understood.

¶ 7     On August 9, 2022, the trial court set the defendant's trial for the jury call that was scheduled to begin on September 19, 2022. On September 15, 2022, the defendant, in an answer filed in response to supplemental discovery from the State, stated that he might assert the affirmative defense of self-defense at trial. *Id.* ¶ 12. At this point in the proceedings, the defendant was represented by Alia Horwick of the Champaign County Public Defender's Office, who had been his counsel since earlier in 2022. *Id.* ¶ 11. Also on September 15, 2022, the defendant filed a motion to continue his trial based on the alleged unavailability of a witness. *Id.* ¶ 12. The State agreed, via email, to stipulate to that witness's statement, which was made on September 7, 2022, via telephone, and the trial court denied the defendant's motion, ruling that pursuant to statute, there was no basis for a continuance. *Id.*

¶ 8     At a final pretrial hearing on September 19, 2022, the day before the defendant's jury trial was scheduled to begin, Horwick renewed her motion to continue, stating that the allegedly unavailable witness—who was not identified by name in the motion or at the hearing—was "important" to the defense strategy. The State objected, opining that the witness's testimony was "not going to make a difference," because it related to "a statement over two years after [the] incident," and the State had recordings of "jail calls where [the defendant is] literally telling them what to say on those statements." The State agreed to allow "that entire statement" to be read to

3

the jury. Horwick argued that the live presence of the witness was necessary so that the witness could clarify her statement, and Horwick added that she "was not assigned this case until earlier this year" because the defendant had private counsel until then. She asserted that she did not "think it would be fair to penalize [her] because of it sitting with private counsel for that amount of time."

¶ 9 The trial court stated that it was not attempting "to penalize anybody," but that the defendant's case was "extremely old," and Horwick had been on "the case for a while." The trial court added that it was "a little unusual for a witness to be disclosed so late, so long after a case has been filed," and that although in general the absence of a witness was a valid reason to seek a continuance, in this case the State had agreed "to stipulate to the statement in its entirety," which meant that there was no longer a valid basis to continue the trial. The trial court stated that "[w]hether a continuance might allow the person to be subpoenaed is speculative, whether if subpoenaed [the witness would] show up is speculative, and whether the clarification would assist the defense is speculative when the State is making representations that perhaps they can show that it's fabricated to begin with."

¶ 10 The trial court ruled that, based on the totality of the evidence, it would "deny the motion to reconsider the denial of the motion to continue." The trial court added, "This remains set for trial tomorrow," and that "[i]f for some reason this is going to be resolved one way or the other," the parties should notify the trial court "by about 3:30" that afternoon, so that the court could "call off jurors."

¶ 11 At the outset of the proceedings held the next morning, September 20, 2022, the trial court stated that it was the trial court's understanding that the defendant—who was present with Horwick—and the State were "in discussion about a possible plea," but that if needed, the trial court had "jurors downstairs waiting" for a possible trial. The parties attended to some pretrial

4

matters outside the presence of the potential jurors, then the trial court announced a brief recess. Prior to the recess, the trial court again arraigned the defendant on all four counts against him. Among the other issues discussed prior to the recess was that the currently-existing offer was for the defendant to plead guilty to aggravated battery with a firearm in exchange for a 15-year prison sentence to be served at 85%. Following the recess, the trial court stated that it understood that there had "been further negotiations," the State had consulted with the alleged victim, and that "there may very well be a plea to count [I]."

¶ 12 The trial court explained to the defendant that count I alleged that on August 1, 2020, the defendant "committed aggravated battery with a firearm in that [the defendant], in committing a battery, knowingly discharged a firearm causing bodily harm to" the victim, Christian Mbemba. The trial court ensured the defendant understood the charge and the possible penalties he faced, that he was not impaired by medication or disability, and that he understood the rights he was giving up by pleading guilty. The trial court specifically informed the defendant that because count I was a Class X felony, probation was not an option. The trial court further informed the defendant that he "would have to go to prison sometime between six and thirty years," that his sentence would have to be served at 85%, and that "[t]here would be up to three years of mandatory supervised release." The trial court then ensured the defendant's plea was voluntary, not the result of coercion or pressure.

¶ 13 When the trial court asked the defendant if anyone had "forced, threatened or pressured" the defendant to plead guilty, the defendant responded, "Pressure? No, sir." The trial court followed up, stating, "All right. Well, you said pressure. Did, did somebody pressure you in any way?" The defendant again responded, "No." The trial court again stated, "All right," then the defendant added, "I mean, the court's pressuring me." The trial court responded, "Well, I

5

understand this is not something anybody ever wants to do, and in terms of pressure, we—this is set for a trial, so, in a sense, there is a jury out there putting pressure on you to decide what to do, but other than that, did anybody personally pressure you?" The defendant answered, "No, sir."

¶ 14    When asked for the terms of the negotiated plea agreement, the State explained that in exchange for the plea of guilty to count I, the State would dismiss counts II-IV. The State added that the defendant "would receive credits for—credit for 262 days served." The State began to state that the defendant would provide DNA samples, but the defendant interrupted, saying "No, no." The defendant thereafter stated, "700—," the trial court stated, "You said 262—," and the State clarified "762." The State added, "Yeah. Sorry. I—762 days served."

¶ 15    The State continued that it would dismiss an additional misdemeanor charge, and that the defendant "would owe $934 per the financial sentencing order before any waiver." The defendant and Horwick both agreed that the foregoing were the terms of the plea agreement. The State did not specifically state that the plea agreement was for a 15-year sentence to be served at 85%. Neither the defendant, nor Horwick, pointed this out, or objected to the State's omission of this term of the agreement. When asked by the trial court, the defendant agreed that no additional promises had been made to him to entice him to plead guilty.

¶ 16    The State recited the factual basis for the plea, which included that following "an altercation" with the victim, "[t]he defendant produced a revolver, chased after the victim, shot him two times and then fled the scene." Horwick agreed that the State could produce witnesses who would testify to that factual basis. The defendant then entered his plea of guilty to the charge of aggravated battery with a firearm, and the trial court stated that it found him guilty. The trial court added that it found that the defendant's plea was "knowingly, understandingly, and voluntarily made," that it was supported by a factual basis, and that the trial court accepted it.

6

¶ 17    The trial court entered judgment on the plea and immediately proceeded to sentencing. The parties waived a presentence investigation, the State recited the defendant's criminal history, and the trial court stated that the defendant's sentence would be "15 years in the Illinois Department of Corrections at 85%," and that the defendant was "to serve three years of mandatory supervised release." The trial court added that the defendant was "entitled to credit for 762 [days] previously served," and was "to pay financial obligations as set forth in the attached" financial assessment schedule. The trial court admonished the defendant of his appeal rights, and stated that a mittimus was to issue.

¶ 18    Also on September 20, 2022, the defendant executed a written waiver of his right to a trial by jury. That same day, a written sentencing order was filed, which contained the terms discussed above, including a 15-year prison sentence to be served at 85%, along with a minimum of 3 years of mandatory supervised release. The mittimus, which was also filed on September 20, 2022, likewise included a 15-year prison sentence to be served at 85%, along with 3 years of mandatory supervised release.

¶ 19    On October 3, 2022, the defendant filed a *pro se* motion to withdraw his guilty plea, and a *pro se* motion to reduce his sentence. The defendant subsequently made additional *pro se* filings. On January 17, 2023, new counsel was appointed to represent the defendant on his postplea motions.

¶ 20    On March 1, 2023, postplea counsel filed an amended motion to withdraw guilty plea and vacate judgment. Therein, counsel raised three claims of ineffective assistance of plea counsel, and further claimed that (1) the defendant "did not understand what he was pleading guilty to [and] did not understand the sentence he was agreeing to," (2) the defendant's sentence was "excessive," and (3) the Illinois statute punishing aggravated battery with a firearm was "no longer valid after

7

its renumbering." Counsel also filed a certificate pursuant to Illinois Supreme Court Rule 604(d). Counsel did not attach any affidavits to the amended motion.

¶ 21    Following a hearing held on April 19, 2023, at which argument was presented but evidence was not, the trial court denied the amended motion to withdraw guilty plea and vacate judgment, and also denied a *pro se* petition for relief from judgment that the defendant had filed. The trial court specifically stated that there was "no proof here whatsoever that [Horwick] intimated, forced, threatened, pressured him in any way. This was a plea at the last moment, which I understand, which happens all the time." On appeal, this court vacated the trial court's denial of the amended motion to withdraw guilty plea and vacate judgment, and remanded for further proceedings, because postplea counsel did not adequately comply with Rule 604(d), despite her written certification that she did. *Toms*, 2025 IL App (5th) 230275-U, ¶¶ 27-33.

¶ 22    On March 21, 2025, the defendant, represented by new postplea counsel, filed his second amended motion to withdraw his guilty plea and to vacate his sentence (motion), which is the subject of this appeal. In the motion, the defendant claimed that Horwick told him she would subpoena two witnesses—Kirlin Johnson and Sierra Johnson—whose testimony the defendant believed would corroborate his claim of self-defense at trial. In particular, the defendant claimed that the witnesses would testify that (1) the "victim brutally attacked" him "immediately before the shooting occurred," (2) Kirlin Johnson observed "a silver clip from a gun inside a book bag" the victim was carrying, and (3) both witnesses saw the victim pull "a gun out and point[ ] it at [the defendant]," who "grabbed it from him." The defendant asserted that he entered his plea of guilty "because he was told by [Horwick] that these witnesses *** had not been subpoenaed as of the day trial was set to begin," and that he "was told that the trial judge was not going to allow a continuance, so he had to either proceed to trial without these crucial witnesses, or plead guilty."

8

The defendant also stated that "[w]hen the terms of the plea agreement were recited by the State to the Court during the plea, and when the Defendant confirmed to the court that the terms recited by the State constituted the plea agreement, no mention was made of the term of imprisonment the Defendant was to receive."

¶ 23    The defendant contended "that the following errors resulted in him entering the guilty plea," and then alleged three ineffective assistance of counsel claims against Horwick, which were based upon, respectively, Horwick's failure to (1) file a motion to dismiss count III (attempted murder) on the basis that the statute concerning it was "unconstitutionally vague," (2) subpoena Sierra Johnson and Kirlin Johnson to testify at his trial in support of "his self-defense claim," and (3) file a motion to dismiss count I (aggravated battery with a firearm) on the basis that it was "no longer valid after its renumbering." He further stated that it was clear from the record that the defendant "did not verbally agree to any term of imprisonment in open court when he entered the plea." The motion was accompanied by exhibits, including an affidavit from the defendant, and by new postplea counsel's Rule 604(d) certificate. The defendant's affidavit, which was attested to on March 18, 2025, stated that, *inter alia*, "[b]ased on [the defendant's] understanding of what Kirlin Johnson and Sierra Johnson would have seen at the scene of the shooting," it was the defendant's "understanding that their testimony would have been as" described in the motion, and as reiterated in the affidavit. The affidavit also stated, "I currently do not know the whereabouts of or contact information for Sierra Johnson and Kirlin Johnson."

¶ 24    On July 21, 2025, a hearing was held on the motion. New postplea counsel requested that the trial court consider, as the defense's only evidence at the hearing, the defendant's affidavit, and the transcript from the guilty plea proceedings. Counsel stated that neither he nor the defendant knew the whereabouts of Kirlin Johnson or Sierra Johnson. The State objected to consideration of

9

the defendant's affidavit, characterizing the affidavit as being based on "speculation," because the affidavit stated "what the defendant believes somebody would say," without any "indication of what they actually would say," and without any "affidavit from them." The trial court stated that it would consider the affidavit, because it believed the affidavit was admissible, and the State's argument went to the question of how much weight to accord to the affidavit, not its admissibility.

¶ 25 The State called Horwick as its sole witness. She testified that she had been an attorney for approximately 15 years, and that she served as a public defender for a total of approximately 5 years. Horwick testified that she previously represented the defendant in this case, that she communicated with the defendant about the case, and that they discussed "considerations of trial versus reaching a plea deal." She testified that she never withheld anything from the defendant, that she informed him that she believed he was mistaken about some of the points of law he wanted her to attempt to raise, and that she never found a legal basis for raising his claim that count III should be dismissed because the statute was "unconstitutionally vague."

¶ 26 Horwick testified that she recalled discussing with the defendant the two potential witnesses that he wanted her to subpoena, but that she did not subpoena the witnesses because neither Horwick nor the investigator for the public defender's office was ever able to track down Sierra Johnson, and when the investigator spoke with Kirlin Johnson, "her version of events did not corroborate what [the defendant] had stated." Horwick added, "So I don't know that she would have been a helpful witness. She did say that she may be willing to sign an affidavit. But after that initial interview with the investigator, our office was not able to contact her." Horwick testified that she explained this to the defendant, never withheld information about the potential witnesses from the defendant, and did not lie to the defendant about them.

10

¶ 27    She testified that Kirlin Johnson did not actually witness "the shooting event," and "never saw any gun." Horwick therefore "did not think that would help with [the defendant's] self-defense claim." With regard to Sierra Johnson, with whom neither she nor the investigator had spoken, Horwick testified she did not subpoena her because she "had no idea what she would say, if she would have testified. And it could—it could be helpful and maybe it would not be helpful, but I had no idea." When asked if she "ever found it useful to subpoena in a witness that you're not entirely sure what they might testify to in court," Horwick answered, "I have never subpoenaed a witness that I have not spoken to first."

¶ 28    Horwick testified that she did not recall the defendant ever expressing to her "that he felt forced into taking a plea deal" because the witnesses were not subpoenaed. She added that the offer that existed on the date of the plea deal "was the same offer he'd had for a while," and that "there had been points in my representation and conversations with [the defendant] where he had thought about taking the plea, but was unsure." She added that "about a week or so before" the scheduled trial date, she asked the State "to leave the offer open and not revoke it just in case," which the State agreed to do.

¶ 29    Horwick testified that she also informed the defendant that there was no legal basis for his claim that the aggravated battery with a firearm statute was invalid due to renumbering or due to an errant citation by the State. She described the defendant as "a very strong advocate for himself" who "would do a lot of his own research," and testified that she "would definitely look into" any legal issues he raised. With regard to the defendant's statement that he was not told in open court how many years in prison the plea agreement involved, Horwick testified that prior to the recitation of the terms of the plea agreement in open court, the defendant was "aware of the full terms of" the agreement, because they "had discussed it several times before." She testified that it was

11

ultimately the defendant's decision to enter the plea agreement. She testified that to her knowledge, there was no confusion about the terms of the agreement. With regard to the possible self-defense claim, Horwick reiterated that there was no evidence to corroborate such a claim, and stated that "[t]he only thing we would have would be his own testimony at that point."

¶ 30 On cross-examination, Horwick agreed that she could have made "efforts" to have the sheriff's department subpoena the potential witnesses, but that she did not. She agreed that Kirlin Johnson told the "investigator that she saw a silver clip in a bag that the victim had been carrying," which Horwick stated "could" corroborate a small detail of the defendant's "version of events in terms of self-defense."

¶ 31 On re-direct examination, Horwick again testified that she did not subpoena Sierra Johnson because she did not know what her testimony would be, and that if Horwick called her, Sierra Johnson might offer "something that was in opposition to" the defendant, which would be detrimental to their case. Horwick also again testified that she did not think Kirlin Johnson's testimony would help the defendant. On re-cross examination, Horwick agreed that on the date of the plea agreement, she made it clear to the defendant that the trial court would not grant a motion to continue the trial, and that the defendant had to either accept the State's offer or go to trial.

¶ 32 During argument, the trial court noted that no affidavits were provided by the two potential witnesses, and they were not present to testify. The trial court asked new postplea counsel how the trial court could "know really what they would have come in to say" if they had testified. New postplea counsel conceded that he had "not been able to find them" to learn what testimony they could offer. After a brief pause in the proceedings during which counsel spoke with the defendant off the record, counsel stated, "My client is telling me that he does have phone numbers for these individuals." Counsel added, "That's not my recollection of what our conversation was, but he

12

indicates he does have phone numbers for those individuals." Counsel asked to continue the hearing so that he could "talk to them and then perhaps move to reopen the proofs to present their testimony."

¶ 33    The State objected, noting, among other things, that the defendant "suddenly" having knowledge of their whereabouts was contradicted by his affidavit, in which he had stated that he did not know their whereabouts or their contact information. The State characterized the defendant's "sudden" knowledge as "simply just not believable." The trial court stated, "I agree with the State. This matter has been set for a very long time. And from the beginning, these witnesses have been difficult to reach." The trial court added, "There is the motion filed by the defense indicating that they were having difficulty finding [the witnesses]. There is the affidavit [by the defendant saying] he wasn't aware of contact information." The trial court also noted that new postplea counsel had just stated "here in open court" that the defendant's claim to have the phone numbers of the potential witnesses was "not his recollection of the conversation with his client." The trial court ruled that "based on the totality of the information" before the court, the court would "deny the motion to continue."

¶ 34    At the conclusion of the parties' arguments, the trial court noted that it was the defendant's motion, and then stated, "The defense called no witnesses. The defendant did not testify. Really the only evidence that the court has are the pleadings and the affidavit by the defendant which is self-serving. It is filled with speculation and hearsay." The trial court added that it found Horwick to be a credible witness. Addressing the three ineffective assistance of counsel claims, the trial court concluded that with regard to each claim, Horwick's performance was not deficient, and additionally that the defendant could not show that he was prejudiced by any of her alleged deficiencies.

13

¶ 35    With regard to the defendant's statement that he "did not verbally agree to any term of imprisonment in open court when he entered the plea," the trial court stated that although the defendant "technically may be correct," the record showed that prior to the plea, the parties discussed the currently-existing offer, which was a 15-year prison sentence to be served at 85%. The trial court added that "Horwick testified that this had been the offer for some time," and that "[t]he defendant was aware of the offer on that day in question. He knew that was the offer. So the fact that the words weren't uttered or that he verbally agreed to that specific term, he was fully on notice of what the agreement was and did not object at the time." The trial court then stated, "I don't find that there's a basis in fact or law for him to be allowed to withdraw his plea because of that one failure which to some extent was caused by the defendant's interruption" of the proceedings to clarify how many days of credit for time spent in presentence custody the defendant would receive.

¶ 36    For all of these reasons, the trial court denied the motion. This timely appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    As noted above, OSAD has filed an *Anders* motion to withdraw as counsel in this appeal. In the legal memorandum that accompanies the motion, OSAD raises three potential issues: (1) whether the defendant knowingly and voluntarily pleaded guilty, (2) whether the trial court erred in denying the defendant's motion to withdraw his guilty plea, and (3) whether new postplea counsel's Illinois Supreme Court Rule 604(d) certificates strictly comply with that Rule, as well as whether counsel provided the requisite level of representation. However, OSAD concludes that none of these potential issues has arguable merit. For the reasons that follow, we agree.

¶ 39    The first potential issue raised by OSAD is whether the defendant knowingly and voluntarily pleaded guilty. OSAD recites many of the same facts that we have recounted above

14

about the events that occurred at the defendant's September 20, 2022, guilty plea proceedings. OSAD concludes that the trial court "substantially complied with Illinois Supreme Court Rule 402," and that there was no error, even though OSAD contends the defendant "did not execute a written jury waiver." OSAD notes in particular that the trial court informed the defendant of "the nature of the charges, the range of potential sentences, that he had the right to persist in a not guilty plea and to have a trial by jury," as well as that if the defendant "entered the plea, he would waive the right to either a jury or bench trial, what those trials entailed, and all other rights he was giving up." See Ill. S. Ct. R. 402 (eff. July 1, 2012).

¶ 40    We agree that the trial court's admonishments, which we have described in detail above, were more than sufficient to safeguard the rights of the defendant, and to comply with Rule 402. Moreover, as also described above, the defendant did in fact execute a written waiver of his right to a trial by jury, which is included as page 131 in the common law portion of the record on appeal. For these reasons, OSAD is correct that this potential issue has no merit.

¶ 41    In his response to OSAD's motion to withdraw as counsel, the defendant claims that OSAD's motion "completely ignores" the defendant's response to the trial court's questioning at the guilty plea proceedings, "where [the defendant] told the court that he felt pressured by the trial court in forcing [him] to trial without the benefit of his witnesses, and not granting the *** request for a continuance." However, the defendant's claim that he made such a statement to the trial court is positively rebutted by the transcript of the guilty plea proceedings. As described above, during those proceedings, when the trial court asked the defendant if anyone had "forced, threatened or pressured" the defendant to plead guilty, the defendant responded, "Pressure? No, sir." The trial court followed up, stating, "All right. Well, you said pressure. Did, did somebody pressure you in any way?" The defendant again responded, "No." The trial court again stated, "All right," then the

15

defendant added, "I mean, the court's pressuring me." The trial court responded, "Well, I understand this is not something anybody ever wants to do, and in terms of pressure, we—this is set for a trial, so, in a sense, there is a jury out there putting pressure on you to decide what to do, but other than that, did anybody personally pressure you?" The defendant answered, "No, sir."

¶ 42    Certainly, if the defendant felt pressured to plead guilty because his two potential witnesses were not going to be present for the trial, and the trial would not be continued, the defendant should have told the court that. He did not. Instead, the defendant twice answered that no one had pressured him, then said it a third time after the trial court responded to his statement that the court was pressuring him. Despite the trial court's repeated questioning, at no time during the guilty plea proceedings did the defendant raise the absence of his potential witnesses as a source of pressure on him, or blame Horwick for their absence. He also did not state, at any point, that he felt pressured to plead guilty because the trial court denied Horwick's motion to continue. His current assertions to the contrary are self-serving and simply not credible. This is especially true in light of the fact that mere moments after the above-quoted exchange with the trial court, the defendant demonstrated that he was perfectly capable of speaking up for himself, when he interrupted the State's recitation of the terms of the plea agreement to correct the State's misstatement of how many days of credit for time spent in presentence custody he would receive.

¶ 43    In addition, Horwick—whom the trial court found to be a credible witness—testified at the hearing on the motion that she did not recall the defendant ever expressing to her "that he felt forced into taking a plea deal" because the witnesses were not subpoenaed. She added that the offer that existed on the date of the plea deal "was the same offer he'd had for a while," and that "there had been points in my representation and conversations with [the defendant] where he had thought about taking the plea, but was unsure." Thus, the proposed plea agreement was not new,

16

and the defendant cannot reasonably argue that he was pressured because he did not have adequate time to consider its terms. For all of these reasons, we conclude there is no factual support, and no objectively reasonable basis, for the defendant's claim that he felt pressured to plead guilty due to the absence of his potential witnesses and the lack of a continuance.

¶ 44 The second potential issue raised by OSAD is whether the trial court erred in denying the motion. OSAD correctly notes that because a defendant does not have an absolute right to withdraw a guilty plea, the defendant bears the burden of demonstrating to the trial court the necessity of withdrawing the plea. OSAD also correctly notes that the denial of a motion to withdraw a guilty plea is generally reviewed for an abuse of the trial court's discretion. See, *e.g.*, *People v. Manning*, 227 Ill. 2d 403, 411-12 (2008).

¶ 45 OSAD points out that the motion made several allegations that Horwick provided ineffective assistance of counsel, described in detail above. OSAD correctly states that "[a] challenge to a guilty plea which alleges ineffective assistance of counsel is subject to a modified version of the test from *Strickland v. Washington*, 466 U.S. 668 (1984)," and that under this modified test, "a defendant must establish that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." See, *e.g.*, *People v. Brown*, 2017 IL 121681, ¶ 26. Pursuant to this test, a conclusory allegation that the defendant would not have pleaded guilty and would have demanded a trial is not sufficient to establish prejudice. *Id.*

¶ 46 With regard to the defendant's allegations of ineffective assistance of counsel, we agree with OSAD that in this case, the defendant cannot show that Horwick's failure to subpoena the two potential witnesses fell below an objective standard of reasonable representation. He has not

17

provided affidavits from the potential witnesses to substantiate that they would have testified as he claims they would have. We note that, as the State and the trial court pointed out at various times in the proceedings below, the idea that if subpoenaed, the witnesses would have shown up, and would have testified as the defendant believes they would have, is highly speculative, and is based upon nothing but the defendant's self-serving affidavit.

¶ 47 Moreover, Horwick explained in detail why she did not attempt to subpoena the witnesses, and her explanations were reasonable and appropriate under the circumstances of this case. The defendant has provided no coherent argument, at any point, that it would be unreasonable for an attorney to choose not to attempt to subpoena a potential witness when the attorney has not been able to locate and speak with that potential witness and therefore has no idea how that witness would testify at trial. Horwick testified that she had not been able to locate or speak with Sierra Johnson, and did not know what her testimony might be. When asked if she "ever found it useful to subpoena in a witness that you're not entirely sure what they might testify to in court," Horwick answered, "I have never subpoenaed a witness that I have not spoken to first." As Horwick thereafter pointed out, Sierra Johnson might have provided testimony that was detrimental to the defendant, not helpful, which would have greatly complicated any attempt to defend the case.

¶ 48 With regard to Kirlin Johnson, the defendant claimed in the motion and in his affidavit that he believed she would testify that she observed "a silver clip from a gun inside a book bag" the victim was carrying, and saw the victim pull "a gun out and point[ ] it at [the defendant]," who "grabbed it from him." However, Horwick testified that Kirlin Johnson did not actually witness "the shooting event," and "never saw any gun." Moreover, the factual basis presented by the State was that the gun involved in the shooting was a revolver, not an automatic weapon that would have had a clip, a fact that renders Kirlin Johnson's potential testimony about a clip much less relevant,

18

and potentially less credible. In addition, Horwick testified that after Kirlin Johnson's initial interview with Horwick's investigator, Horwick was not able to contact her again, which meant that Horwick could not attempt, prior to trial, to address any discrepancies between what Kirlin Johnson stated that she saw, and what the defendant believed she would have seen. Under these circumstances, it was not unreasonable for Horwick to choose not to attempt to subpoena Kirlin Johnson, whose testimony, like that of Sierra Johnson, ultimately could have been detrimental, rather than helpful, to the defendant.

¶ 49    With regard to the defendant's other ineffective assistance of plea counsel claims, there is no legal basis for the defendant's contention that the statutes under which he was charged were unconstitutionally vague or were void for renumbering. He has had multiple opportunities to attempt to present meritorious arguments on these issues, and has not provided any legitimate legal basis for any of his theories. Thus, there is no legal support for these claims of ineffective assistance of counsel.

¶ 50    In his response to OSAD's motion to withdraw, the defendant also claims that "the trial court judge never explicitly stated on the record that the defendant's fifteen year term of imprisonment would be followed by (3) years mandatory supervised release." However, the defendant did not raise any claim related to mandatory supervised release in the motion, or in his affidavit. In fact, he did not mention mandatory supervised release at all in either document. A defendant who fails to raise a claim in a motion to withdraw the defendant's guilty plea may not raise that claim for the first time on appeal. See Ill. S. Ct. R. 604(d) (eff. Apr. 15, 2024) ("Upon appeal any issue not raised by the defendant in the motion to *** withdraw the plea of guilty and vacate the judgment shall be deemed waived."); see also *People v. Ratliff*, 2024 IL 129356, ¶ 26 ("Rule 604(d) is unmistakably clear: Any issue not raised in a postplea motion is 'waived' on

appeal."). Accordingly, the defendant's claim related to mandatory supervised release is waived, and we will not consider it. See *id.* ¶ 28 (where defendant did not bring claim in trial court, that "court did not have the opportunity to address and correct any errors"; accordingly, "the defendant's omission of that issue in his postplea motions waived consideration of it on review," and the Illinois Supreme Court would not consider the issue).

¶ 51    To the extent the defendant's argument is an inartful attempt to argue what actually was included in the motion—the statements that (1) "[w]hen the terms of the plea agreement were recited by the State to the Court during the plea, and when the Defendant confirmed to the court that the terms recited by the State constituted the plea agreement, no mention was made of the term of imprisonment the Defendant was to receive," and (2) it was clear from the record that the defendant "did not verbally agree to any term of imprisonment in open court when he entered the plea"—there is no arguable merit to any claims related to these statements. As the trial court correctly pointed out when addressing the defendant's statements, the record demonstrates that prior to the plea, the parties discussed the currently-existing offer, which was a 15-year prison sentence to be served at 85%. No new offers were made on the record by either party that would have changed those terms. In addition, Horwick testified that prior to the recitation of the terms of the plea agreement in open court, the defendant was "aware of the full terms of" the agreement, because they "had discussed it several times before."

¶ 52    It is true that the State did not specifically state that the plea agreement was for a 15-year sentence to be served at 85%, but it is also true that neither the defendant, nor Horwick, pointed this out, or objected to the State's omission of this term of the agreement. In fact, when the defendant was asked, he agreed that no additional promises had been made to him to entice him to plead guilty, which—in light of the omission of the express sentencing term—means that he

20

represented to the court that he had *not* been promised a specific prison sentence. In addition, the defendant did not state—when the trial court told the defendant that his sentence would be "15 years in the Illinois Department of Corrections at 85%," and that the defendant was "to serve three years of mandatory supervised release"—that the sentence was incorrect or was otherwise inconsistent with the terms of the plea agreement the defendant had just entered. Finally, the defendant did not contend, in the motion or in his affidavit, that his guilty plea was induced by the absence of the terms, or that he would not have entered the plea if the terms had been stated on the record by the State during the guilty plea proceedings. For all of these reasons, there is no factual support, and no legal basis, for any claim that the defendant did not understand the terms of the plea agreement, that the agreement was somehow incomplete, or that the defendant should be allowed to withdraw his guilty plea because of this issue.

¶ 53    The final potential issue raised by OSAD is whether new postplea counsel's Illinois Supreme Court Rule 604(d) certificates strictly comply with that Rule, and whether counsel provided the requisite level of representation. As OSAD notes, Illinois Supreme Court Rule 604(d) (eff. Apr. 15, 2024) requires, as part of postplea counsel's duties when representing a defendant on a motion to withdraw a guilty plea, that postplea counsel must file a certificate stating (1) that counsel "consulted with the defendant *** to ascertain defendant's contentions of error in the sentence and the entry of the plea of guilty," (2) that counsel "examined the trial court file and both the report of proceedings of the plea of guilty and the report of proceedings in the sentencing hearing," and (3) that counsel "made any amendments to the motion necessary for the adequate presentation of any defects in those proceedings." As OSAD points out, new postplea counsel's certificate in this case tracks the language of Rule 604(d) nearly verbatim, and nothing in the record on appeal contradicts it. To the contrary, the record shows that postplea counsel made amendments

21

to the defendant's previous motions, included the defendant's affidavit addressing the claims, and, during the hearing that followed, questioned Horwick regarding the grounds allegedly justifying the defendant's withdrawal of his plea. Accordingly, we agree this potential issue has no merit.

¶ 54                                III. CONCLUSION

¶ 55    For the foregoing reasons, we conclude that the trial court did not abuse its discretion when it denied the motion. See, *e.g.*, *Manning*, 227 Ill. 2d at 411-12. Accordingly, OSAD's motion to withdraw is granted, and the judgment of the circuit court is affirmed.


¶ 56    Motion granted; judgment affirmed.